IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION

| | |
|---|---|
| **CURTISTINE JOHNSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.  ) | Civil Action No. 1:07-0944 |
| ) | |
| **HARLEY LAPPIN, Director,** ) | |
| **Federal Bureau of Prisons,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

On December 17, 2007, Plaintiff, acting *pro se* and incarcerated at FPC Alderson, filed a "Complaint of Tort Liability." (Document No. 1.) Plaintiff names the following as Defendants: (1) Harley Lappin, Director of Federal Bureau of Prisons; (2) Amber Nelson, Warden of FPC Alderson; (3) Deborah Hickey, former Warden of FPC Alderson; (4) Health Services Unit Staff; (5) Greenbrier Valley Medical Center Director; (6) Greenbrier Valley Medical Center Staff; (7) Roanoke Memorial Hospital Director; and (8) Roanoke Memorial Hospital Staff. (Id.) Plaintiff alleges that Defendants acted with deliberate indifference to her serious medical needs, which resulted in the premature birth and subsequent death of her baby. (Id.) Specifically, Plaintiff states as follows:

> I, Curtistine Johnson, arrived at Alderson Federal Prison Camp on January 7, 2005. I was pregnant, but did not know it until I arrived at Alderson. I was medically cleared and assigned to Central Dining Room (CDR) for a job until May 8, 2005. My job consisted of standing to wipe and clear tables after each person ate, mopping, sweeping, serving food to other inmates as dictated by officers in charge. In April 2005, I began to have symptoms of dizziness, blurred visions, and nausea. An officer notified D.O. Rehburg (doctor of osteopathic), Chief Medical Director. On or about April 26, 2005, after going to sick call at HSU (health services unit) several times, I was moved from the top bunk to lower bunk, to the bottom level housing unit because of medical restrictions. One week later, I was moved back upstairs on the 2nd floor of the housing unit by Cynthia Godbold, Unit Manager for A building. This move required that I walk up and down approximately 20 steps (2 flights) for meals, commissary, education, psychology, and administration building, etc.
> On or about May 23, 2005, at 9:00 a.m., I began to have contractions and they continued. I went to HSU, Nurse Elmore, asking that she notify D.O. Rehburg that

I was having contractions that had not subsided. However, Nurse Elmore, stated that I was "out of bounds" since I had failed to come to sick call (7:00 a.m.), which would result in an incident report to administration. I informed her that the contractions did not start until 9:00 a.m. Nurse Elmore then told me to sit down in the waiting room while she spoke to D.O. Rehberg. After speaking to D.O. Rehberg, Nurse Elmore, put me in an exam room to wait for Rehberg. She then took my vital signs, asking how much water I had been drinking? I responded about 64 oz a day. She then advised me that I needed to drink more water, stating that "the contractions may be from lack of water." D.O. Rehburg came into the exam room where he again checked my blood pressure then proceeded to question me about the "contractions." He asked if I had other pregnancies, and other children. I advised D.O. Rehburg that the contractions were about 4 minutes apart, that I knew what "contractions" were. He decided to wait for the next contraction, then advised me to 'drink more water, the contractions will stop." The contractions continued throughout the day and night, I returned to HSU for sick call the following morning. Nurse Renick came by after I had been waiting in the waiting room for quite sometime. I had decided to speak to her since she was the nurse who took care of OB/GYN at Alderson, FPC. She then took me into an exam room to check my cervix. Nurse Renick stated "she wasn't sure if my cervix was dilated since the cervix is "high." Nurse Renick took a urine sample, since she stated that a UTI (urinary tract infection) could sometimes cause contractions. Nurse Renick stated that she saw "traces of something" and prescribed cephalexin 500 mg.

    I returned to the housing unit to lay down. The contractions continued and worsened throughout and I returned to HSU and waited for someone to check me. Another inmate went to get Nurse Renick since I was in severe pain with the contractions. I stated to Nurse Renick that the pain was unbearable. She then decided to check me again. Renick stated at this point that I had dilated to 5 and rushed out of the exam room to get help. She was wearing bloody gloves, which indicated to me that I needed to get somewhere for help. The staff then rushed to call an ambulance and started IVs. During this time, one of the nurses stated that they did not have the medication needed to slow the contractions down. I then had to wait for the ambulance to get to the camp to transport me to Greenbrier Valley Medical Center. After arriving at the Greenbrier Medical Center, I was rushed to what I understood to be L&D (labor and delivery) where I was advised that I needed an emergency C-section because the baby was "in trouble." When I woke up from the sedation and surgery, the doctor explained that after the baby was born that Greenbrier Valley Medical Center did not have the specific medication needed for the baby, that there was complications with my baby's breathing, and that he would be transported to Roanoke Memorial Hospital as soon as possible. He then stated that he would have a nurse to bring my baby in so that I could see him before he was transported to Roanoke Memorial. The first report I received from the doctor at Roanoke Memorial was that the baby was doing well. Later when someone called me back, however, I was asked whether I wanted to keep my baby on life support or not. At this point I realized my baby was having trouble. I am assuming that the doctor was the person who called me later and stated my baby had died.

(<u>Id.</u>, pp. 3 - 5.) Plaintiff further asserts that following the death of her baby, she had "no follow-up treatment, grief counseling, [or] opportunity to grieve with family."(<u>Id.</u>, p. 8.) Plaintiff therefore contends that Defendants' failure to provide adequate medical care resulted in cruel and unusual punishment. (<u>Id.</u>, p. 7.) Plaintiff claims that "this heinous event has caused a slow mental decline, which affects the Plaintiff's life, quality of life, and lifestyles, and will continue to do so in the future, and in fact for the duration of her lifetime." (<u>Id.</u>, p. 8.) Plaintiff requests monetary relief. (<u>Id.</u>, p. 7.)

As a general matter, punishments prohibited under the Eighth Amendment include those which "involve the unnecessary and wanton infliction of pain." <u>Estelle v. Gamble</u>, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(<u>quoting</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (4th Cir. 1996). Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." <u>Wolfish v. Levi</u>, 573 F.2d 118, 125 (2d Cir. 1978), <u>rev'd on other grounds,</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Thus, sentenced prisoners are entitled to reasonable protection from harm at the hands of fellow inmates and prison officials under the Eighth Amendment. <u>See</u> <u>Farmer v. Brennan,</u> 511 U.S. 825, 832-34, 114 S.Ct. 1970, 1976-77, 128 L.Ed.2d 811 (1994); <u>Trop v. Dulles</u>, 356 U.S. 86, 102, 78 S.Ct. 590, 598-99, 2 L.Ed.2d 630 (1958); <u>Woodhous v. Commonwealth of Virginia</u>, 487 F.2d 889, 890 (4th Cir. 1973). Inmates' claims therefore, that prison officials disregarded specific known risks to inmates' health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. <u>See</u> <u>Pressly v. Hutto</u>, 816 F.2d 977, 979 (4th Cir. 1987); <u>Moore v. Winebrenner</u>, 927 F.2d 1312, 1316 (4th Cir. 1991) <u>cert. denied</u>, 502 U.S. 828, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991) (Stating that supervisory liability may be imposed where prison supervisors "obdurately," "wantonly," or "with deliberate indifference" fail to address a known pervasive risk of harm to an inmate's health or safety). To establish a violation of the Eighth Amendment in the context of a

challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.")

Federal inmates may file claims of personal liability against individual prison officials for violations of their constitutional and civil rights pursuant to Bivens v. Six Unknown Named Federal Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), but may not assert claims against the government or prison officials in their official capacities. Federal inmates also may file claims of liability against the United States under the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 2671, et seq.[1] but may not assert claims of personal liability against prison officials for violations of their constitutional rights. See Carlson v. Green, 446 U.S. 14, 21-23, 100

---

[1] The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

4

S.Ct. 1468, 1472-74, 64 L.Ed.2d 15 (1980). Because Plaintiff's complaint contains allegations only against the named individual Defendants and not the United States and has claimed violations of her constitutional rights, the Court finds that Plaintiff states cognizable claims pursuant to <u>Bivens v. Six Unknown Named Federal Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), i.e., that Defendants have violated her constitutional rights in providing her with medical care. If Plaintiff's intent was to file an action against the United States pursuant to the FTCA, Plaintiff should notify the Court of her intent in writing. Otherwise, this civil action will be regarded as arising under <u>Bivens</u>.

Although Plaintiff has stated a cognizable claim under <u>Bivens</u>, the undersigned finds that Plaintiff has neither paid the filing fee nor submitted an Application to Proceed *in forma pauperis* or Without Prepayment of Fees. Before the undersigned will require Defendants to respond to Plaintiff's claims, Plaintiff must pay the Court's filing fee of $350 or obtain approval to proceed *in forma pauperis* or without prepayment of fees. Title 28 U.S.C. § 1915 provides as follows:

> (a)(1) Subject to subsection (b), any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such prisoner possesses that the person is unable to pay such fees or give security therefor. Such affidavit shall state the nature of the action, defense or appeal and affiant's belief that the person is entitled to redress.

Accordingly, it is hereby **ORDERED** that Plaintiff shall pay the Court's filing fee or submit an Application to Proceed *in forma pauperis* or Without Prepayment of Fees in conformity with 28 U.S.C. § 1915 within twenty (20) days from the date of this Order. Failure of the Plaintiff to file a complete Application to Proceed *in forma pauperis* or Without Prepayment of Fees within twenty (20) days from the date of this Order will result in a recommendation of dismissal of this matter

without prejudice Pursuant to Rule 41(b) of the Federal Rules of Civil Procedure [2] and Rule 41.1 of the Local Rules of Civil Procedure for the Southern District of West Virginia[3].

The Clerk is hereby directed to send a copy of this Order to the Plaintiff, who is acting *pro se*, and counsel of record. The Clerk is further requested to send Plaintiff a form Application to Proceed Without Prepayment of Fees.

ENTER: September 21, 2010.

R. Clarke VanDervort
United States Magistrate Judge

---

[2] Rule 41(b) of the Federal Rules of Civil Procedure provides:

**(b) Involuntary Dismissal: Effect**. If the plaintiff fails to prosecute or to comply with these rules or any order of court, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule - - except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19 - - operates as an adjudication on the merits.

[3] Rule 41.1 of the Local Rules provides:

**Dismissal of Actions**. When it appears in any pending civil action that the principal issues have been adjudicated or have become moot, or that the parties have shown no interest in further prosecution, the judicial officer may give notice to all counsel and unrepresented parties that the action will be dismissed 30 days after the date of the notice unless good cause for its retention on the docket is shown. In the absence of good cause shown within that period of time, the judicial officer may dismiss the action. The clerk shall transmit a copy of any order of dismissal to all counsel and unrepresented parties. This rule does not modify or affect provisions for dismissal of actions under FR Civ P 41 or any other authority.